**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| IA LABS CA, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>NINTENDO CO., LTD. *et. al.,*<br><br>Defendants. | Civil Action No. 8:10-CV-00833-PJM<br><br>JURY TRIAL |

**DECLARATION OF R. LEE RAWLS IN SUPPORT OF NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.'S OPPOSITION TO IA LABS CA, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, R. Lee Rawls, declare as follows:

1. I am a partner in a mechanical engineering and design firm doing business as Jump Design Innovations, LLC. My *curriculum vitae* is attached to this declaration as Exhibit 1. I am primarily engaged by my clients doing product development and product design. I work for clients in many diverse industries, presently including the marine industry, medical devices, high volume consumer products, optical equipment, outdoor equipment, aerospace, bicycle components, musical instruments and electronics packaging.

2. I was the Vice President of Engineering and R&D for StairMaster Sports/Medical Products, Inc. from 1991 to 1999. During that time I routinely evaluated our competitors' products, evaluated new exercise products on the market, invented new exercise products, and led the design of new exercise products. I was responsible for the design and development of numerous exercise devices with computer interfaces including the StairMaster stair climbers, Stepmill, Crossrobics machines and a line of computerized strength equipment. I was involved in

product management and the manufacturing of physical therapy and exercise equipment from 1986 to 1991 with Loredan Biomedical Inc.

3. I received my Masters Degree from the University of California at Davis in 1986. My area of study was Physical Education: Biomechanics.

4. I have been retained by Perkins Coie LLP on behalf of Defendants Nintendo Co., Ltd. and Nintendo of America Inc. to provide my independent expert opinion concerning issues involving U.S. Patent No. 7,121,982 (the "'982 patent"), the patent at issue in *IA Labs CA, LLC v. Nintendo Co. Ltd. and Nintendo of America, Inc.*, Civ. No. 8:10-cv-00833-PJM.

5. Attached as Exhibit 2 to this declaration is a true and correct copy of the expert report I previously provided in this litigation on November 2, 2010 regarding claim construction, non-infringement and invalidity issues involving the '982 patent. I hereby incorporate the opinions stated in my November 2 report as if completely restated in this declaration.

6. I also submitted a declaration to the United States Patent and Trademark Office in connection with the '982 patent reexamination addressing certain issues raised by IA Labs during that proceeding. Attached as Exhibit 12 to this declaration is a true and correct copy of the declaration I submitted to the USPTO.

7. As stated in my November 2 expert report (Exhibit 2): The field of art involved here is computer linked exercise equipment. This is a fairly broad category covering many types of exercise devices and a range of levels of computer interaction. Persons successfully developing products in this field could have a wide range of educational backgrounds and experience. In my opinion, a person having ordinary skill in the art as of the file date of the '982 patent would have at least a Bachelor's degree (or equivalent experience) in a related field, and

with education or proficiency with computers, and with interest and experience with exercise equipment, and 2 to 3 years experience in a related field.

8. In forming the opinions and explanations discussed below, I have carefully considered the materials cited and discussed in my November 2 expert report as well as the following additional materials:

- Request for Reexamination of U.S Patent 7,121,982, dated October 1, 2010
- Order granting request for inter partes reexamination, dated Nov 18 2010
- Inter Partes Reexamination Office Action, dated Nov 18 2010
- Patent owner's response to inter partes reexamination initial office action, dated January 18, 2011
- Final Order Closing Prosecution of the Reexam of U.S. Patent 7,121,982.
- U.S. Patent 6,389,883 to Berme et al.. May 21, 2002

9. In the Final Order Closing Prosecution of the Reexam of U.S. Patent 7,121,982 (Exhibit 10) examiner found that the 'S' type load cell disclosed in Dang and Suzuki do not include the claim limitation of an 'elongated rod.' The examiner wrote:

> *"Dictionary.com defines 'rod' as "a stick, wand, staff or the like, of wood, metal or other material", or "a slim cylinder of metal, wood, etc; stick or shaft" or "a straight slender cylindrical formation". Thus an elongated rod, as claimed is seen as an elongated or lengthened stick, shaft or staff. The specification of the '982 patent does not specify an explicit definition of this term, but effector bars 104, 106 and 108 of the patent are lengthened shafts with lengths many times their diameters. The central portion of the load cell, such as the Interface load cell disclosed by Dang (with the datasheet supplied by the requester) is not seen as an elongated bar." (page 5 of Exhibit 10).*

Although the Examiner's interpretation does not expressly explain what "lengthened" means in this context, the Examiner distinguished the '982 invention from the prior art on the basis that the "elongated rod" of claims 1 and 9 must have a length that is many times its diameter. For example, the IVES device described by the Dang article includes a load cell with a length to width ratio of approximately 4 to 1. The Examiner concluded this was not long enough. It

would seem that the claimed "elongated rod," as interpreted by the Examiner, has a length to width ratio that many times greater than the 4 to 1 length-to-width ratio of the Dang load cell.

10. I have reviewed and considered U.S. Patent 6,389,883 to Berme et al.. May 21, 2002 (Berme or '883 patent) (Exhibit 3). I was unaware of the Berme patent at the time of my original expert report, and I understand this reference was not considered by the examiner during the reexamination of the '982 patent.

11. In my opinion, the Berme patent describes a balance platform much like the Suzuki '745 and '373 patents and Li '997 described in my original expert report. However, the Berme patent discloses a "load sensing member" with a different configuration from the load cells previously considered by the Examiner. Figure 3 of the Berme patent (shown below) depicts a beam (labeled 36) with strain gauges (labeled 40) attached.




FIG–3

In my opinion, beam 36 shown in the Berme patent satisfies the examiner's definition of an "elongated rod," because, e.g. it is clearly a "lengthened" piece of material and has a length-to-width ration that is many times greater than the Dang load cell.

12. In my opinion, using the Examiner's interpretation of the '982 patent in the reexamination, beam 36 from the Berme patent meets the "effector" and "sensor" limitations of

claims 1 and 9 of the ‘982 patent: The elongated beam has at least one sensor coupled to it, it is responsive to forces applied by the user, it is deformed by forces applied by the user and that deformation is measured by the sensor coupled to it.

13. The Berme patent discloses a balance platform or force plate. My initial expert report discusses balance platforms and force plates generally at Paragraphs 178 - 181. Generally speaking, a balance platform (or a force plate) is a platform upon which a person applies force that is situated on a set of load cells. As a person stands on or walks across the plate an internal member is deformed; that deformation is measured with a type of strain gauge and the strain gauge information is translated into force information. These devices are very old technology and are often custom made in research labs and universities. The shape of the internal member to be deformed can vary widely.

14. I have considered whether the Li, Suzuki and IVES (or Dang) prior art disclosures in combination with the Berme patent render the ‘982 patent “obvious” from the perspective a person having ordinary skill in the art as of the filing date of the ’982 patent application. In performing this analysis, I considered 1) the scope and content of the prior art, 2) differences between the prior art and the claims at issue, and 3) the level of ordinary skill in the pertinent art at the time of the application. I have also considered whether combining the prior art elements as claimed by the ’982 patent would have been within the capabilities of a person having ordinary skill in the art, and whether the combination would have resulted in any unexpected or surprising results. I have also considered whether any “secondary considerations” relevant to obviousness, such as commercial success, long felt but unsolved needs and the failure of others, exist.

15. As described below in more detail, it is my opinion that the claims at issue of the ’982 patent would have been obvious to a person having ordinary skill in the art at the ’982 patent application in view of the Berme, Li, Suzuki, IVES and Yamashima prior art devices.

**Li and Berme:**

16. As described in my expert report, the Li patent (attached as Exhibit 5 to this declaration) describes a balance platform upon which a user stands. By shifting one’s weight one is able to control computer on-screen activity in a manner very similar to that of a joystick.

17. In my opinion, it would have been obvious to a person having ordinary skill in the art at the time of the ‘982 patent to substitute the balance platform of the Berme patent (Exhibit 3) for the balance platform of Li (Exhibit 5). The platform component of Li and Berme (‘883) are both balance platforms. They both use strain gauges to measure the deformation of a member within the device that receives loading from the user. As such the Li device already includes the circuitry designed to receive the type of input that it would receive from the Berme balance platform strain gauges. Both Li and the Berme device measure the same thing in the same way using strain gauges that are applied somewhat different structures.

18. We don’t know from the disclosure the shape or configuration of the load cells in Li (although the patent mentions a Neurocom Balance Master balance platform, a similar device to what is described by the Berme patent). I know such a structure exists, however, because the patent describes measuring a person’s weight-shifts using strain gauges. Using the Berme platform in the Li device replaces a load cell of unknown shape with a load cell that meets the ”elongated rod” requirement of the ‘982 patent as that limitation has been interpreted by the Patent Examiner in the ’982 patent reexamination. This combination is nothing more than a simple substitution, i.e. replacing one balance platform with another.

19. The Berme balance platform is capable of measuring all of the forces that the balance platform of Li measures. The Berme patent describes how to measure additional forces and moments by adding strain gauges to the elongated beam. It is my opinion that a person having ordinary skill in the art at the time therefore would have recognized that the Berme patent describes a balance platform with certain advantages over the platform of Li. The Berme platform would be capable of enhanced control as an input device for a game controller. However, a person having ordinary skill in the art would have recognized that the Berme force platform could have been incorporated into Li with or without this additional force measuring capability.

20. A person having ordinary skill in the art of the ’982 invention would recognize the force platforms of Berme and Li as interchangeable and would also recognize possible advantages of using the balance platform of the ‘883 patent in the computer input device disclosed by Li. For example, the Berme balance platform, as described in the patent, is portable, has a lower profile, and could have additional axis of force measurement.

21. In my opinion, the device described above, where the balance platform of the Berme patent is used in the device of Li, includes all of the elements of claims: 1-2, 4-10, 12-17, 19-23, and 25-28 as described in the claim chart I prepared that is attached as Exhibit 6 to this declaration. It is my opinion that this combination would have been well-within the capabilities and skill of a person having ordinary skill in that art as of the filing date of the ’982 patent, and leads to no unexpected or surprising results.

**Suzuki and Berme:**

22. In my opinion, it would have been obvious to a person having ordinary skill in the art as of the filing date of the '982 patent to substitute the balance platform described by the Berme patent for the balance platform described by the Suzuki publications.

23. As I described in my initial expert report, the Suzuki publications describe a device with which a balance platform is used, much like a mouse, to control on-screen computer software, including games.

24. The platform components of Suzuki and Berme ('883) are both balance platforms. They both use strain gauges to measure the deformation of a member within the device that receives loading from the user. Both measure weight in the same way using strain gauges that are configured using slightly different structures. The difference between the "load cells" of Suzuki and Berme is that one is relatively short and S-shaped (Suzuki) and one is an elongated metal bar (Berme). Combining Berme's balance platform with the Suzuki device is nothing more than a simple substitution, i.e. replacing one balance platform with another.

25. The Berme balance platform is capable of measuring all of the forces that the balance platform of Suzuki measures. The Berme patent describes how to measure additional forces and moments by adding strain gauges to the elongated beam. It is my opinion that a person having ordinary skill in the art at the time therefore would have recognized that the Berme patent describes a balance platform with certain advantages over the platform of Suzuki. The Berme platform would be capable of enhanced control as an input device for a game controller. However, a person having ordinary skill in the art would have recognized that the Berme force platform could have been incorporated into Suzuki with or without this additional force measuring capability.

26. A person of ordinary skill would recognize the Suzuki and Berme force platforms as interchangeable and would also recognize the possible advantages of using the balance platform of the ‘883 patent in the game controller disclosed by Suzuki. For example, the Berme balance platform, as described in the patent, is portable, has a lower profile, and could have additional axis of force measurement.

27. Combining Suzuki and Berme by substituting the balance platform of the Berme patent into the input device described by Suzuki would include all of the elements of claims: 1-2, 4-10, 12-17, 19-23, and 25-28 as described in the claim chart I prepared and attached to this declaration as Exhibit 4. It is my opinion that this combination would have been well-within the capabilities and skill of a person having ordinary skill in that art as of the filing date of the ’982 patent.

**Dang and Berme:**

28. In my opinion, it also would have been obvious to a person having ordinary skill in the art at the time of the ‘982 patent to substitute the balance platform of the Berme patent for the ‘Foot Box’ of Dang (Exhibit 7). The Foot Box of Dang and the balance platform of Berme (‘883) both measure force applied downward by a person’s feet by using strain gauges. Dang uses an ‘S’ type load cell with a short deformable member and Berme uses a long load cell deformable member. Either one could be placed under a person’s feet on the Dang device and either one would produce a signal proportional to the downward force applied by the user. Dang already includes the circuitry to interpret strain gauge output so reading the output from Berme would be a simple matter.

29. In my opinion, the combination of Dang and the balance platform of the ‘883 patent is nothing more than a simple substitution, replacing one force measurement device with

another. They both measure the same thing in the same way using strain gauges that are applied to somewhat different structures. The essential difference in those structures being that one is relatively short and part of an S-shaped member (IVES) and one is a significantly elongated beam (Berme). The combination is nothing more than a simple substitution, i.e. replacing one balance platform with another.

30. The balance platform described by the Berme patent is capable of measuring all of the forces that the Foot Box of Dang measures. It discloses how to measure additional forces and moments by adding strain gauges to the beam, but without adding additional structure. Because of this the balance platform of Berme could be used by the Dang device to measure other forces (forward and back, or side to side) as well. This capability could enhance Dang's effectiveness as a game controller. The Berme force platform could have been incorporated into Dang with or without the additional force measuring capability.

31. A person having ordinary skill would have recognized the force platform of the Berme patent as interchangeable with the Foot Box of Dang and would also recognize the possible advantages of using the balance platform of the '883 patent in the game controller disclosed by Dang.

32. The device described above, i.e. where the balance platform of the Berme patent is used with the IVES device described by the Dang article, would includes all of the elements of claims 1-2, 4-10, 12-17, 19-23, and 25-28 as described in the invalidity claim chart I prepared and attached as Exhibit 8 to this declaration.

**Yamashima:**

33. It would also have been obvious to a person of skill in the art at the time of the '982 patent to substitute the input device of Yamashima (Exhibit 9) for the balance platform of

Li or Suzuki. Resulting in a device with the Yamashima input device with the Li or Suzuki computer interface.

34. With regard to Yamashima; In the Final Order Closing Prosecution of the Reexam of U.S. Patent 7,121,982 (Exhibit 10) the examiner found that the device of Yamashima includes an "effector" that meets all of the claim limitations of claim 1, including the "elongated rod" requirement. The Examiner wrote: "*The handle 9 is seen as part of the effector, as well as strain plate 24, which is seen as an elongated rod that deforms when force is applied to handle 9. This is seen to meet the limitations of claim 1*." (Page 22 end of last paragraph).

35. According to the Examiner, what Yamashima lacks is the processor and a description of a "virtual reality scenario" as described by the '982 patent. Li and Suzuki do have these features and, in combination with Yamashima, therefore fill in the missing claim elements. In my opinion, combining Yamashima with Li or Suzuki in this manner would have been obvious to a person having ordinary skill in the art of the '982 patent as of the filing date of the application.

36. In my opinion, a person having ordinary skill in the art would have understood that Li describes a balance platform that can be used to control computer games in the manner of a joystick. The ordinary artisan would have also understood that Yamashima discloses a chair with two handles that are manipulated by a user. If the Li (or Suzuki) computer interface were used with the Yamashima inputs the combined device would have the measurement or training capability of Yamashima with the engaging benefit of a virtual reality scenario.

37. The motivation to a person having ordinary skill in the art of the '982 patent at the time of the alleged invention to create more engaging computer-linked exercise, training or assessment products would have been ever-present in the industry. Persons of skill in the art

would have recognized the potential of improving Yamashima by adding a processor and the capabilities described by Li or Suzuki. It is my opinion that it would have been well within the capabilities of a person having ordinary skill in the art at the time of the ’982 patent to combine the processor of Li or Suzuki with the Yamashima device.

38. The device described above, that combines the input device of Yamashima with the processor capabilities of Li or Suzuki, would include all of the elements of claims 1-2, 4-6, 8-10, 12-14, 16, 17, 19-23, and 25-28 as described in the claim chart I prepared and attached as Exhibit 11 to this declaration. From the perspective of a person having ordinary skill in the art at the time with knowledge of Li, Suzuki and Yamashima, this combination would have been a trivial use of known components according to their intended function with no unexpected or surprising results.

## The System and Method Claims of the ’982 Patent

39. For each of the claims in the ’982 patent that recites an apparatus or device (claims 1-8, 17-19, 23, 24 and 27) there is a corresponding claim that describes matching functional elements (claims 9-16, 20-22, 25, 26, and 28). The claim tree below illustrates the one-to-one correspondence between the ’982 patent apparatus and method claims.




40. Nothing new is introduced from one set of claims to the other. For example, to a person having ordinary skill in the art, it would have been obvious to use the structure of claim 1 for its intended purpose as described by claim 9. Similarly the structure described by claim 1 would have been obvious to a person having ordinary skill in the art in light of the method described by claim 9. The same can be said for each corresponding apparatus and method claim.

41. I certify that the foregoing statements made by me are true. I am aware that if any foregoing statements made by me are willfully false, I am subject to punishment.

Executed this 16th day of May, 2011, in Woodinville, Washington:

R. Lee Rawls